

U.S. Department of Justice

*United States Attorney*
*District of Maryland*
*Southern Division*

Thomas P. Windom
Chief, Southern Division
thomas.windom@usdoj.gov

Mailing Address
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770-1249

Office Location
6406 Ivy Lane, 8th Floor
Greenbelt, MD 20770-1249

MAIN 301-344-4433
FAX 301-344-4516

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2021 JUN 11 P 12: 03

CLERK'S OFFICE
AT GREENBELT

KOH

May 24, 2021

Ned Smock, Esq.
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770

> Re: United States v. Brian Mark Lemley, Jr.,
> Criminal No. TDC-20-33 (D. Md.)
> Criminal No. [TBD] (Rule 20 Transfer of Criminal No. 20-09 (D. Del.))
> TDC-21-0205

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Brian Mark Lemley, Jr. (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland and the United States Attorney's Office for the District of Delaware ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. on June 4, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

## Offenses of Conviction

1. The Defendant agrees to plead guilty to Counts One, Four, Seven, and Twelve of the Indictment now pending in the District of Maryland under Criminal No. TDC-20-33, which charge the Defendant in Count One with conspiracy to transport certain aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I); in Count Four with transporting certain aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii); in Count Seven with disposing of a firearm and ammunition to an illegal alien, in violation of 18 U.S.C. § 922(d)(5); and in Count Twelve with transporting a firearm and ammunition in interstate commerce with intent to commit a felony, in violation of 18 U.S.C. § 924(b). The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

2. The Defendant further agrees, pursuant to Federal Rule of Criminal Procedure 20, to plead guilty in the District of Maryland to Count Two, Count Three, and Count Six of the Indictment now pending in the District of Delaware under Criminal No. 20-09, which charge the Defendant in Count Two with harboring certain aliens, in violation of 8 U.S.C. § 1324(a)(1)(B)(iii); in Count Three with aiding and abetting an alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5) and 2; and in Count Six with obstruction of justice, in

violation of 18 U.S.C. § 1519. The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

## Elements of the Offenses

3. The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland (as to Criminal No. TDC-20-33) and in the District of Delaware (as to Criminal No. 20-09)—

*Criminal No. TDC-20-33 (D. Md.)*

   a. Count One (Conspiracy to Transport Certain Aliens): (1) The Defendant and one or more persons entered the unlawful agreement charged in the Indictment, that is, an agreement to transport certain aliens; and (2) the Defendant knowingly and willfully became a member of that conspiracy.

   b. Count Four (Transporting Certain Aliens): (1) An alien was in the United States in violation of the law; (2) the Defendant knew, or acted in reckless disregard of the fact, that the person was an alien who had come to, entered, or remained in the United States in violation of the law; (3) the Defendant transported the alien within the United States; and (4) the Defendant acted willfully in furtherance of the alien's violation of law.

   c. Count Seven (Disposing of a Firearm and Ammunition to an Illegal Alien): (1) The Defendant knowingly sold or otherwise disposed of a firearm or ammunition to an alien; (2) the Defendant knew or had reasonable cause to believe that the alien was illegally and unlawfully in the United States; and (3) the sale or disposal affected interstate commerce.

   d. Count Twelve (Transporting a Firearm and Ammunition in Interstate Commerce with Intent to Commit a Felony): (1) The Defendant transported, shipped, or received a firearm or ammunition in interstate commerce; and (2) the Defendant transported, shipped, or received the firearm or ammunition with the intent to commit a crime punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that such a crime would be committed with the firearm, as specified in the Indictment.

*Criminal No. 20-09 (D. Del.)*

   e. Count Two (Harboring Certain Aliens): (1) An alien was in the United States in violation of law; (2) the Defendant knew, or acted in reckless disregard of the fact, that the person was an alien who had come to, entered, or remained in the United States in violation of the law; (3) the Defendant harbored, concealed, or shielded from detection an alien who had come to, entered, or remained in the United States in violation of the law; and (4) the Defendant's actions in harboring, concealing, or

shielding from detection substantially facilitated the alien's ability to remain in the United States.

f. Count Three (Aiding and Abetting an Alien in Possession of a Firearm): (1) The Defendant knowingly aided and abetted an alien in possessing a firearm; (2) at the time of the charged act, the alien was unlawfully and illegally in the United States; (3) at the time of the charged act, the Defendant knew that the alien was unlawfully and illegally in the United States; and (4) the possession charged was in or affecting commerce.

g. Count Six (Obstruction of Justice): (1) The Defendant altered, destroyed, mutilated, concealed, and covered up any record or tangible object as alleged in the Indictment; (2) the Defendant acted knowingly; and (3) the Defendant acted with the intent to impede, obstruct, or influence an investigation or matter within the jurisdiction of a department or agency of the United States Government.

Penalties

4.   The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

*Criminal No. TDC-20-33 (D. Md.)*

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 8 U.S.C. § 1324(a)(1)(A)(v)(I) | N/A | 10 years | 3 years | $250,000 | $100 |
| 4 | 8 U.S.C. § 1324(a)(1)(A)(ii) | N/A | 5 years | 3 years | $250,000 | $100 |
| 7 | 18 U.S.C. § 922(d)(5) | N/A | 10 years | 3 years | $250,000 | $100 |
| 12 | 18 U.S.C. § 924(b) | N/A | 10 years | 3 years | $250,000 | $100 |

*Criminal No. 20-09 (D. Del.)*

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 2 | 8 U.S.C. § 1324(a)(1)(A)(iii) | N/A | 5 years | 3 years | $250,000 | $100 |
| 3 | 18 U.S.C. §§ 922(g)(5) & 2 | N/A | 10 years | 3 years | $250,000 | $100 |
| 6 | 18 U.S.C. § 1519 | N/A | 20 years | 3 years | $250,000 | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

5. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity

Rev. August 2018

4

to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c.  If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d.  The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e.  If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g.  If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

    h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not

relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

6. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

7. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

*Criminal No. TDC-20-33 (D. Md.)*

### Count One (Conspiracy to Transport Certain Aliens):

a. This Office and the Defendant further agree that the applicable base offense level is **12**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2L1.1(a)(3).

b. A **3-level decrease** applies, pursuant to U.S.S.G. § 2L1.1(b)(1), because the offense was committed other than for profit.

c. A **2-level increase** applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct and a closely related offense.

### Count Four (Transporting Certain Aliens):

d. The applicable base offense level is **12**, pursuant to U.S.S.G. § 2L1.1(a)(3).

e. A **3-level decrease** applies, pursuant to U.S.S.G. § 2L1.1(b)(1), because the offense was committed other than for profit.

f. The offense level is increased to **18**, pursuant to U.S.S.G. § 2L1.1(b)(5)(C), because a dangerous weapon (including a firearm) was possessed.

g. A **2-level increase** applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration

of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct and a closely related offense.

Count Seven (Disposing of a Firearm and Ammunition to an Illegal Alien):

  h. The applicable base offense level is **20**, pursuant to U.S.S.G. § 2K2.1(a)(4)(B), because the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine, and the Defendant is convicted under 18 U.S.C. § 922(d).

  i. A **2**-level increase applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct and a closely related offense.

Count Twelve (Transporting a Firearm and Ammunition in Interstate Commerce with Intent to Commit a Felony):

  j. The applicable base offense level is **20**, pursuant to U.S.S.G. § 2K2.1(a)(4)(B), because the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine, and the Defendant is convicted under 18 U.S.C. § 922(d).

  k. A **2**-level increase applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct and a closely related offense.

*Criminal No. 20-09 (D. Del.)*

Count Two (Harboring Certain Aliens):

  l. The applicable base offense level is **12**, pursuant to U.S.S.G. § 2L1.1(a)(3).

  m. A **3**-level decrease applies, pursuant to U.S.S.G. § 2L1.1(b)(1), because the offense was committed other than for profit.

  n. The offense level is increased to **18**, pursuant to U.S.S.G. § 2L1.1(b)(5)(C), because a dangerous weapon (including a firearm) was possessed.

  o. A **2**-level increase applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct and a closely related offense.

Count Three (Aiding and Abetting an Alien in Possession of a Firearm):

p. The applicable base offense level is **20**, pursuant to U.S.S.G. § 2K2.1(a)(4)(B), because the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine, and the Defendant is convicted under 18 U.S.C. § 922(d).

q. A **2-level** increase applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct and a closely related offense.

Count Six (Obstruction of Justice):

r. The applicable base offense level is **14**, pursuant to U.S.S.G. § 2J1.2.

s. A **2-level** increase applies, pursuant to U.S.S.G. § 2J1.2(b)(3)(B), because the offense involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter.

*Grouping*

t. There is no agreement as to the applicability or inapplicability of the grouping rules set forth in U.S.S.G. § 3D1.1, 3D1.2, 3D1.3, and 3D1.4.

*Reservation of Rights Regarding Guidelines*

u. In addition to the agreed-upon Guideline provisions above, this Office and the Defendant reserve the right to argue for or against the applicability of any other Guideline or Guideline provision, including but not limited to: U.S.S.G. §§ 2K2.1(b)(6)(B) (use or possession of a firearm in connection with another felony offense), 2L1.1 application note 7 (upward departure), 3A1.1(a) (hate crime motivation or vulnerable victim), 3A1.2(a) (official victim), 3A1.4(a) and (b) (terrorism), and 4A1.3(a) (inadequacy of criminal history category).

*Acceptance of Responsibility*

v. This Office does not oppose a **2-level** reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office will <u>not</u> make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1-level** decrease. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs

or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

*No Agreement as to Criminal History*

8. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). **Specifically, the Defendant may advocate for any sentence at or above the aggregate statutory minimums (zero days imprisonment), and the Government may advocate for any sentence at or below the aggregate statutory maximums (70 years imprisonment), notwithstanding the advisory Guideline range.** This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant in Criminal No. TDC-20-33 (D. Md.) and Criminal No. 20-09 (D. Del.).

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

i. The Defendant reserves the right to appeal any term of imprisonment that exceeds the aggregate statutory minimum (zero days) for any reason, including (but not limited to) grounds that the Court misapplied any Guideline enhancement not agreed to by the parties; and

ii. This Office reserves the right to appeal any term of imprisonment that is below the aggregate statutory maximum (70 years) for any reason, including (but not limited to) grounds that the Court misapplied any Guideline enhancement not agreed to by the parties.

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: all firearms and ammunitions seized from the Defendant's residence in Delaware on or about January 16, 2020.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

14. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil

or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Abandonment

16. The Defendant knowingly and voluntarily waives any right, title, and interest in any property seized from the Defendant's residence in Delaware on or about January 16, 2020 (the "Abandoned Property").

17. The Defendant agrees not to contest the vesting of title of the Abandoned Property in the United States Government and agrees to unconditionally release and hold harmless the United States Government, its officers, employees, and agents, from any and all claims, demands, damages, causes of actions, suits, of whatever kind and description, and wheresoever situated, that might now exist or hereafter exist by reason of or growing out of or affecting, directly or indirectly, the seizure or waiver of ownership interest in the Abandoned Property. The Defendant agrees to execute any documents as necessary to the waiver of right, title, and interest in the Abandoned Property, including any forms necessary to effect the Defendant's waiver of ownership interest.

## Defendant's Conduct Prior to Sentencing and Breach

18. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

19. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

20. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

21. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney for the District of Maryland

_____
Thomas P. Windom
Thomas M. Sullivan
Assistant United States Attorney

David C. Weiss
United States Attorney for the District of Delaware

**ADRIENNE DEDJINOU** Digitally signed by ADRIENNE DEDJINOU
Date: 2021.06.08 13:28:58 -04'00'
_____
Adrienne C. Dedjinou
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

06/01/21                                      _____
Date                                          Brian Mark Lemley, Jr.

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

6/1/21                                        _____
Date                                          Ned Smock, Esq.

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, **BRIAN MARK LEMLEY, JR.** ("**LEMLEY**"), was a member of an organization called "THE BASE." Co-defendants **Patrik Jordan Mathews** ("**Mathews**") and **William Garfield Bilbrough** ("**Bilbrough**") also were members of THE BASE.

## THE BASE

Since 2018, THE BASE has been building a group within the United States and abroad through, among other things, online chat rooms, in-person meetings, propaganda, and military training. THE BASE recruits through its online presence, among other means. Applicants submit an application form. Applicants are then vetted. Once admitted into the organization, BASE members are afforded access to a secure messaging group, which members—including **LEMLEY**, **Mathews**, and **Bilbrough**—accessed and participated in through applications on their cell phones.

## The August 2019 BASE Training Camps

Members of THE BASE conducted a regional training camp in Georgia from August 2 through August 4, 2019. **LEMLEY** and **Bilbrough** traveled in **LEMLEY**'s vehicle to attend the training camp, and while there participated in tactical training and firearm drills.

Later in August 2019, **LEMLEY** and **Bilbrough** attended another THE BASE training camp in a different state. The photograph below was taken at that separate training camp. In the photograph, **LEMLEY** is standing second from the left while holding a long gun straight in the air, and **Bilbrough** is kneeling in the center under THE BASE flag while holding a blade.



## Mathews's Arrival in the United States

On August 19, 2019, the Winnipeg (Canada) Free Press published an article regarding one of its reporters' infiltration of THE BASE. While acting in an undercover capacity on behalf of the Winnipeg Free Press, the reporter was telephonically interviewed by THE BASE leadership to become a member. Upon completion of the telephone interview, THE BASE leadership arranged an in-person meeting with **Mathews**, a local THE BASE member residing in the area of Winnipeg, Canada. The reporting led to the identification of **Mathews** as the THE BASE member the reporter had met in person. Thereafter, **Mathews** fled Canada and illegally entered the United States. At some point thereafter, **LEMLEY** and **Bilbrough** learned that **Mathews** had unlawfully crossed the border.

On or about August 30, 2019, **LEMLEY** and **Bilbrough** traveled in **LEMLEY**'s truck from Maryland to southern Michigan (roughly 600 miles, just off the Indiana Toll Road) to pick up **Mathews**. At the time they drove to Michigan to pick up **Mathews**, **LEMLEY** understood that **Mathews** was a fellow member of THE BASE, that **Mathews** had entered the United States unlawfully, and that **LEMLEY** and **Bilbrough** were driving to pick up **Mathews** in order to transport **Mathews** to the East Coast, where **Mathews** could safely reside in the United States and continue his participation in THE BASE. **LEMLEY** and **Bilbrough** remained in the Michigan

Rev. August 2018

15

area for approximately two hours, after which all three headed back east. **LEMLEY** drove **Mathews** and **Bilbrough** during part of the return trip to Maryland.

On the evening of August 31, 2019, **LEMLEY** and **Mathews** dropped **Bilbrough** off at Bilbrough's house in Denton, Maryland. Thereafter, **LEMLEY** drove **Mathews** to in or around Chincoteague, Virginia, in order to conceal **Mathews**'s presence in the United States.

On Saturday, September 14, 2019, **LEMLEY** traveled in his vehicle from the area of his residence in Elkton, Maryland, area to Chincoteague Island, Virginia. **LEMLEY** stopped in Chincoteague Island for approximately two hours, during which time he picked up **Mathews**. **LEMLEY** and **Mathews** then traveled south and utilized the Chesapeake Bay Bridge Tunnel in the vicinity of Norfolk, Virginia, as shown in the following photograph taken at the Chesapeake Bay Bridge Tunnel:



On Sunday, September 15, 2019, at approximately 3:00 a.m., **LEMLEY** and **Mathews** arrived in Rome, Georgia, in the vicinity of a known THE BASE member's residence. Approximately five hours later, **LEMLEY** departed and headed north and east toward Maryland. **Mathews** stayed at the Georgia property.

### The October/November Training Camp in Georgia

On or about October 30, 2019, **LEMLEY** picked up **Bilbrough** at **Bilbrough**'s residence in Maryland and drove south to Georgia to attend a training camp at the property of another member of THE BASE. **Mathews**, who already was residing at the Georgia property, also attended the training camp. While in Georgia, on or about November 2, 2019, **LEMLEY** and **Bilbrough** purchased approximately 1,550 rounds of 5.56 mm ammunition. Late in the evening on November 2, 2019, **LEMLEY**, **Mathews**, and **Bilbrough** traveled from Georgia to Maryland. On November 3, 2019, **LEMLEY** and **Mathews** dropped **Bilbrough** off at **Bilbrough**'s residence. From there, **LEMLEY** and **Mathews** traveled to the area of Elkton, Maryland, where **Mathews** spent the night at a motel minutes from **LEMLEY**'s residence.

### The Delaware Residence

On November 4, 2019, **Mathews** left the motel near **LEMLEY**'s residence in Maryland on foot, carrying a rolling duffel bag. After ordering food from a nearby restaurant and obtaining a drink from a convenience store, **Mathews** walked into the woods behind the restaurant, where he remained until **LEMLEY** picked him up. **LEMLEY** and **Mathews** then drove to a bank and then to an apartment complex in Newark, Delaware (just across the state line from Elkton, Maryland), where **LEMLEY** entered the leasing office while **Mathews** remained in the vehicle. After leaving the leasing office, **LEMLEY** and **Mathews** entered one of the buildings of the apartment complex, where they were later observed unloading luggage. Thereafter, **LEMLEY** and **Mathews** primarily resided in the Delaware residence.

On December 20, 2019, inside the Delaware residence, **Mathews** took steps to construct a rifle out of various weapon parts. The same day, **LEMLEY** and **Mathews** discussed the rifle, and **Mathews** watched a video on his phone that provided directions on constructing the rifle. Furthermore, **LEMLEY** and **Mathews** discussed weapon parts that needed to be obtained to finish constructing the rifle. On December 21, 2019, **LEMLEY** and **Mathews** discussed obtaining weapon parts for the rifle. **LEMLEY** and **Mathews** held and manipulated the rifle throughout the day.

On December 29, 2019, **LEMLEY** and **Mathews** discussed visiting a gun range to test fire the newly constructed rifle. **LEMLEY** told **Mathews** that he had planned to go to a gun range with another THE BASE member, but that **Mathews** "might not be able to go because of [Mathews's] ID situation," which was a reference to **Mathews** not having a lawful identification and therefore not being permitted to use a business-operated gun range. **LEMLEY** then went on to describe a "public range" that they could use.

On January 2, 2020, **LEMLEY** took the rifle from the Delaware residence to a public gun range in Maryland. An FBI agent observed **LEMLEY** at the gun range.

On January 5, 2020, **Mathews**, **LEMLEY**, and one of **LEMLEY**'s relatives departed the Delaware residence with at least one firearm. All three went from the Delaware residence to the same public gun range in Maryland that **LEMLEY** had gone to on January 2, 2020. Prior to their arrival, the FBI had set up a stationary camera in a vehicle near the gun range, and an ATF agent

was in the vicinity of the range. On the stationary camera, agents observed and recorded **Mathews** in possession of a firearm. While **Mathews** fired the rifle, **LEMLEY** observed **Mathews's** shots through an unattached rifle scope.

On January 7, 2020, **LEMLEY** ordered approximately 1,500 rounds of 5.56 mm and 6.5 mm ammunition. This ammunition fit two rifles possessed by **LEMLEY** and **Mathews**.

On January 11, 2020, **LEMLEY** drove **Mathews** from the Delaware residence to the same gun range in Maryland they had visited on January 5, 2020. While at the range, **Mathews** handled and fired the rifle. When returning to the Delaware residence from the gun range, **LEMLEY** and **Mathews** stopped by **LEMLEY**'s prior residence in Maryland, where they retrieved at least some of the 1,500 rounds **LEMLEY** had ordered on January 7.

On January 15, 2020, **LEMLEY** and **Mathews** discussed the possibility of going to jail for their conduct. During the conversation, **LEMLEY** told **Mathews**, in sum and substance, "I may be going to jail upon discovery of the propaganda in my cell phone."

Early in the morning on January 16, 2020, federal agents executed federal arrest warrants on **LEMLEY** and **Mathews** at the Delaware residence. Before **LEMLEY** and **Mathews** submitted to the agents, however, **LEMLEY** repeatedly directed **Mathews** to smash his cell phone ("Break your phone"; "Smash it"; "Break it in half. Smash it motherfucker!"). **LEMLEY** and **Mathews** smashed their cell phones and dumped them into the toilet. By destroying the telephone, **LEMLEY** and **Mathews** intended to obstruct or impede, or attempt to obstruct or impede, the administration of justice with respect to the investigation, prosecution, and sentencing of their offenses. Their activity was fully captured on video and audio surveillance equipment installed in the Delaware residence, pursuant to lawful orders issued by the Honorable Richard Andrews, United States District Judge for the District of Delaware.

SO STIPULATED:

_____
Thomas P. Windom
Thomas M. Sullivan
Assistant United States Attorneys
District of Maryland

**ADRIENNE DEDJINOU**  Digitally signed by ADRIENNE DEDJINOU
Date: 2021.06.08 13:48:30 -04'00'
_____
Adrienne C. Dedjinou
Assistant United States Attorney
District of Delaware

_____
Brian Mark Lemley, Jr.
Defendant

_____
Ned Smock, Esq.
Counsel for Defendant